SEARS, ROEBUCK AND CO., Plaintiff,

v.

TEAMSTERS LOCAL UNION NO. 243, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Defendant.

Civ. A. No. 80–72597.

United States District Court, E. D. Michigan, S. D.

Feb. 3, 1981.

S. Richard Pincus, Fox & Grove Chartered, Chicago, Ill., Robert J. Finkel, Levin, Levin, Garvett & Dill, Southfield, Mich., for plaintiff.

Matthew R. Robbins, Milwaukee, Wis., Jerome Coleman, Southfield, Mich., for defendant.

---

## OPINION

FEIKENS, Chief Judge.

The plaintiff Company filed this action under 29 U.S.C. § 185 and 9 U.S.C. § 10(d) to set aside the arbitration Opinion and Award of Richard L. Kanner issued on July 14, 1980. The Arbitrator found that the decision of Sears, Roebuck and Co. to subcontract the work of its Maintenance Agreement Sales Department ("MA Sales") to an outside contractor violated the collective bargaining agreement. The Arbitrator awarded reinstatement of the MA Sales Unit as well as back pay to affected employees from the date of the Award until the date of reinstatement. Both the Union and Company have filed motions for summary judgment. Sears contends that the Award should be set aside on the ground that the Arbitrator exceeded his authority in construing the contract by disregarding the plain and unambiguous contract language. Sears also contends that the remedy of reinstatement is punitive and therefore violates the contract. The Union argues that the Arbitrator was within his power in interpreting the contract the way he did, and seeks to have his decision enforced. The Union objects, however, to the back pay remedy imposed in that it commences as of the date of the Arbitrator's Award rather than extending back to the effective date of the subcontract.

## I.

The facts as set forth in the Arbitration Award are not in dispute. The subcontract at issue affected employees of the Maintenance Sales Department who conducted telephone sales of maintenance agreements for appliances sold by the Company. A comparison of MA Sales results from different Sears' locations between February and June of 1978 showed the Detroit operations selling less than stores in Chicago and Cleveland, resulting in an estimated loss to the Company of over $635,000 over a seven-month period. (Arbitrator Kanner's Opinion [hereafter "Opin."] at 46). Based on this information, the Detroit group manager of Sears, Larry Trettanaro, decided to explore the possibility of obtaining an outside contractor to perform the sales in a more efficient and economical manner. Shortly thereafter, he began negotiations with Service Marketing, Inc., a division of Gracious Lady Services, Inc. ("GLS").

From September 18, 1978 until November 29, 1978, the Union was engaged in a strike over a wage reopener in the contract. On December 14, 1978, approximately two weeks after the strike was settled, the Company entered into a subcontract with GLS to conduct MA Sales for Sears' Detroit group to begin on February 1, 1979. On January 4, 1979, Company representatives notified the Union's business representative, James Esser, of the Company's decision to subcontract, and on January 10, 1979 the Company provided the Union with the "facts and figures" that it relied upon in deciding to subcontract the MA Sales Department work. The Union subsequently filed a grievance claiming that the Company had violated the collective bargaining agreement. When the subcontract was implemented on February 1, 1979, ninety employees (12% of the bargaining unit) were laid off. Under the collective bargaining agreement, the affected employees were permitted to exercise their right to bump into other classifications pursuant to the provisions of the Job Elimination clause.[1]

---

1. Article II, Section 15, provides:

    A. When a job is considered eliminated by the Company, the Company will allow that employe to bump into any classification of equal pay (or less) without prior experience, or any classification previously held. The Company will train the employe in this new classification.

    B. The employe, whose job was eliminated, would be protected for two (2) years as far as the voluntary right of recall in the event a vacancy occurs in that department and classification. Should an employe refuse recall, they have permanently waived their right to recall.

    C. Those employes who are bumped by employes whose job was eliminated will be handled by the lay-off procedure.

## II.

It is well established that arbitration is a favored means of resolving labor disputes and that the courts refrain from reviewing the merits of an arbitration award. However, the Supreme Court also noted in *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), that the Arbitrator's powers are not unlimited in the resolution of labor disputes.

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award. *Id.* at 597, 80 S.Ct. at 1361.

The U. S. Court of Appeals for the Sixth Circuit has further explained in *Detroit Coil Co. v. Intern. Assn. of Machinists & Aerospace Workers*, 594 F.2d 575, 579 (6th Cir. 1979), that

> [t]he arbitrator is confined to the interpretation and application of the collective bargaining agreement, and although he may construe ambiguous contract language, he is without authority to disregard or modify plain and unambiguous provisions. [citations omitted]. Furthermore, "[i]f the arbitrator's award has deviated from the plain meaning of a labor contract provision, it must find support in the contract itself or in prior practices demonstrating relaxation of the literal language." *NF & M Corp. v. United Steelworkers of America*, 524 F.2d 756, 759 (3d Cir. 1975).

The collective bargaining agreement between the parties here specifically covers the subject of subcontracting, as follows:

Article I. Recognition and Representation

Section 10. A. The right to subcontract any type of work within the jurisdiction of the Union shall be vested exclusively with the Company, provided however, that such right to subcontract shall be restricted to work that can be performed more efficiently and economically outside of the bargaining unit, and no work shall be subcontracted solely to discriminate against the Union.

B. The Company agrees, prior to the actual subcontracting, the Company will substantiate such action by submitting facts and figures that the work involved can be done more efficiently and economically.

In its grievance filed on January 23, 1979, the Union claimed that Sears had failed to comply with the conditions set forth in the above subcontracting provision. The grievance was submitted to arbitration before Arbitrator Richard L. Kanner under the contractual grievance procedure.[2]

In his decision issued July 14, 1980, the Arbitrator found that the three conditions imposed by Sections 10(A) and (B) had been met prior to implementation of the subcontract. The Arbitrator found that Sears had adequately complied with the notice provision of Section 10(B) of the contract (Opin. at 12–13), that Sears' decision was not undertaken solely to discriminate against the Union (Opin. at 15), and that Sears' decision was prompted by the "substantial gain in a more efficient and economical operation under the GLS subcontract" (Opin. at 56).

Nonetheless the Arbitrator concluded that an additional implied condition must be read into the contract, namely, that there must be a balancing of the gain in cost savings and efficiency to the employer with the resulting impact on the bargaining unit from the decision to subcontract. In this case, the Arbitrator found that the harm to the bargaining unit outweighed the benefits to Sears in economy and efficiency from the subcontract, and thus concluded that Sears had breached the collective. bargaining agreement.

**2.** Article IV of the parties' collective bargaining agreement.

■ This case is troubling because the result of the Company's decision to subcontract is a harsh one. However, I conclude that the Arbitrator has exceeded his authority in amending the express terms of the contract between the parties. The contract specifies in Article IV, Section 1, that

> The Arbitrator . . . shall have no power to alter or amend in any way the provisions of this Agreement, to imply an agreement between them as to any matters which are not covered by the specific provisions of this agreement or to substitute his judgment for that which this Agreement allows to the parties.

Having found that Sears met all the conditions of the subcontracting provision of the collective bargaining agreement, and finding no deviation from the plain meaning of the provision in the contract itself or in prior practices[3] demonstrating relaxation of the literal language, the Arbitrator's Award does not draw its essence from the collective bargaining agreement, and therefore cannot be enforced.

The Arbitrator reached the conclusion that a balancing test must be applied to evaluate the disputed subcontract for the following reasons: (1) that express subcontracting provisions control over implied rights "only insofar as these provisions add to, vary, or subtract from such applied [sic] rights," so that where, as here, the language merely codifies the Company's implied right to subcontract for efficiency and economy, a balancing test should be implied as well (Opin. at 37); (2) that a literal reading of the subcontracting provision leads to a "nonsensical result, i. e., the ability for economic reasons to destroy the bargaining unit" (Opin. at 36); and (3) that "[w]here the viability of the entire bargaining unit is at stake, as in a subcontract provision, . . . such provision has to expressly and clearly spell out the employer's right to lay-off employees . . . Absent such clear mandate, the subject

provision is to be interpreted as giving the Company a reasonable right to subcontract wherein balancing of interests must be considered. (Opin. at 37–38). None of these reasons are supported by the arbitral precedent discussed by the Arbitrator.

■ A distinction is drawn in arbitration cases between a contract which is silent on the subject of subcontracting and one which expressly addresses the issue. The general rule in the case of a contract which does not address the subject is to imply a limitation of reasonableness on management's right to subcontract and to invoke a balancing test. The factors involved in this balancing of interests are discussed by the arbitrator in *Mead Corporation*, 62 LA 1000 (Bothwell, 1973), in the following terms:

> If the contract is silent on subcontracting, management generally has considerable freedom to contract out work, services or parts, provided the subcontracting is dictated by the requirements of the business, for efficiency or expeditious performance, if there is no intent to undermine the bargaining unit, if it will not deprive a substantial number of employees covered by the agreement of employment, and if the purpose is not to secure the performance of work at lower wages. Arbitrators have generally sustained the right of employers to contract out with these limitations, provided that there was a good faith exercise of management functions in the matter. *Id.* at 1005.

■ Conversely, when the parties to a contract specifically address the subject of subcontracting, their express agreement supersedes any implied conditions. As the arbitrator in *Laclede Gas Co.*, 67 LA 461 (David, 1976), observed,

> [w]hen a contract contains a bargained provision which refers specifically to the exact situation between the parties, it is that particular provision which must gov-

---

**3.** The Arbitrator defined past practice as "ongoing conduct of the parties over a sufficient period of time to warrant the conclusion that the parties have agreed to an interpretation of an ambiguous contract provision." (*Opin.* at

56). He found that the two prior instances of subcontracting by Sears were not sufficient to establish a past practice under this definition. *Id.*

ern the determination of a dispute between them. *Id.* at 464.

Similarly, the arbitrator in *Electric Storage Battery Co.*, 44 LA 782 (Koven, 1965), rejected the union's argument that a balancing theory should apply where the contract specifically addressed subcontracting. Arbitrator Koven upheld the company's decision to subcontract a janitorial job because the work could be performed more "economically and expeditiously" by the subcontractor and therefore met the contract conditions.[4]

Arbitrator Kanner's conclusion that a balancing test should be applied in this case is not supported by the arbitration cases involving express subcontracting provisions which he discusses in his Opinion. The results in those cases turn on the interpretation of the specific subcontracting language involved, and do not, with one exception, add an implied balancing test to the express agreement between the parties.[5] In the absence of any evidence in the record that the parties intended to deviate from the language of the subcontracting provision, I must conclude that Arbitrator Kanner exceeded his authority in reading an implied balancing test into the contract at issue here.

The Arbitrator's second reason for upholding the Union's grievance is that where "the result of such literal interpretation of a contract leads to a wholly nonsensical result, it cannot be presumed that the parties intended such a result." (Opin. at 38). I would agree, however, with Arbitrator Koven's observation in *Electric Storage Battery Co., supra,* at 785, that because

> parties to a contract are charged with full knowledge of its provisions and of the significance of its language (Bond Clothes, Inc., 7 LA 708; 711; Carnation Company, 3 LA 229, 232), the clear meaning of language may be enforced even though the results are contrary to the original expectations of one of the parties (American Smelting and Refining Company, 28 LA 557, 558; Western Union Telegraph Company, 20 LA 756, 758–759).

Where a contract provision is the result of free bargaining between the parties, the arbitrator cannot amend the contract or dispense "his own brand of industrial justice," *United Steelworkers v. Enterprise Wheel & Car Corp., supra,* at 597, 80 S.Ct. at 1361, *Timken Co. v. Local Union No. 1123, United Steelworkers of America,* 482 F.2d 1012, 1015 n.2 (6th Cir. 1973), merely because he views the outcome as unfair.

Finally, the Arbitrator distinguishes two arbitration decisions [6] allowing subcontract-

---

4. Article XII, Section 3, of that contract provides that "The Company agrees not to contract out work which is normally performed by the employees, unless in the opinion of the Company, the work can be performed more economically and expeditiously otherwise. If such contracting out of work will result in the lay-off of other than probationary employees, the matter will be discussed with the Union prior to action being taken by the Company."

5. No balancing test was applied in *Electric Storage Battery Co., supra; Laclede Gas Co., supra; C. G. Conn, Ltd.,* 56 LA 1145 (Sembower, 1971); *Wyman-Gordon Co.,* 57 LA 688 (Hogan, 1971); or *City of Milwaukee,* 59 LA 537 (Mueller, 1972). Rather, the result in each case turned on findings as to whether or not the employer's subcontract met the specific conditions of the subcontracting clause at issue.

A balancing test was justifiably applied in *Champion Papers,* 51 LA 997 (Volz, 1968), where the arbitrator was construing contract language which prohibited subcontracting "until all factors have been carefully considered, including but not limited to . . . (6) pertinent costs factors," and which prohibited lay-offs of regular employees "as a direct result of using outside contractors." *Id.* at 997. The arbitrator interpreted the words "carefully considered" as envisioning "an objective balancing and weighing of all of the relevant factors and a rejection of the proposed contract where the advantage to the Company does not outweigh the injury which will be done to the individual employees affected and to the bargaining unit." *Id.* at 1000.

*Consolidated Aluminum Co.,* 66 LA 1170 (Boals, 1976), is an anomalous case in which the arbitrator, without distinguishing between express and silent contracts, applied a balancing test despite a contract provision allowing the company "to subcontract work so long as it is not done for the purpose of depriving bargaining unit employees of bargaining unit work." *Id.* at 1172.

6. *Electric Storage Battery Co., supra,* (Opin. at 31), and *C. G. Conn, Ltd., supra,* (Opin. at 33).

ing on the basis that those contracts specifically authorized lay-offs in the event of subcontracting. However, the Arbitrator cites no authority to support his view that a subcontracting provision itself has to expressly and clearly spell out the employer's right to lay off employees. He rejects without adequate justification the Company's argument that the lay-off and bumping procedure (Article II, Subsection 15) should be read together with the subcontracting provision in this contract and gives the Company the right to lay off employees as a result of subcontracting.

In view of the clear and unambiguous language of Article I, Sections 10(A) and 10(B), of the collective bargaining agreement and the Arbitrator's findings that the Company met these contract conditions prior to subcontracting, and since the record contains no evidence indicating the parties intended to deviate from the literal language of those provisions, I conclude that the Arbitrator's Award does not draw its essence from the collective bargaining agreement and therefore cannot be enforced. An appropriate Order is entered herewith.